IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 21, 2014 Session

**IN RE LYRIC J.**

**Appeal from the Chancery Court for Smith County**
**No. 2012AA5     Charles K. Smith, Chancellor**

_____

**No. M2014-00806-COA-R3-PT - Filed December 16, 2014**

_____

This appeal arises from the trial court's decision to terminate Father's parental rights to his daughter ("Child"). Father lives in California and was not present for Child's birth. Mother died two days after giving birth, and Mother's mother ("Grandmother") received temporary custody of Child because Father had not been declared the legal father. The final custody hearing granted custody to Grandmother and Father filed an appeal of the custody order. Grandmother filed a petition to terminate Father's parental rights and adopt Child, and Father filed a counter petition to establish paternity and request custody. The court terminated Father's parental rights based on its findings that Father willfully abandoned Child and that terminating Father's parental rights and permitting adoption by Grandmother were in Child's best interest. We find that it has not been established by clear and convincing evidence that Father's failure to visit and support was willful; therefore, the judgment of the Smith County Chancery Court is reversed and the case is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and, BRANDON O. GIBSON, J., joined.

Laura A. Stewart, Nashville, Tennessee, for the appellant, Lance A.

J. Ray Akers, Mt. Juliet, Tennessee, for the appellee, Veronica J.

## OPINION

### BACKGROUND[1]

Erica J. ("Mother") lived in Davidson County, Tennessee. She gave birth to Lyric J. ("Child") in December, 2011, and died two days later. Appellant, Lance A. ("Father"), lives in California and was not present for Child's birth. Appellee, Child's maternal grandmother ("Grandmother"), who lives in Smith County, Tennessee, received temporary custody of Child from the Tennessee Department of Children's Services ("DCS") because Father had not yet been declared the legal father. On January 5, 2012, DCS held a Child and Family Team Meeting at which Father was advised that he could not receive custody because there was no proof that he was Child's biological father. Father was also advised to take a DNA test, which he took that same day.

A hearing was held in Davidson County Juvenile Court on February 27, 2012, at which Father was advised that he should retain a lawyer. Father had not yet filed the DNA test report. The juvenile court magistrate granted Grandmother custody of Child at the final custody hearing on May 21, 2012. Father did not attend the May hearing and did not file an intervening petition for custody between the two hearings. Father later hired an attorney and appealed the custody order to the juvenile court judge. These proceedings were suspended when the termination and adoption petition was filed in Smith County.

Starting in the summer of 2012, Father would call Grandmother about once a month to talk to Child and attempt to set up a visit. Grandmother would let Father talk to Child, but she said she was afraid to let Father visit because he had previously told her that he was going to "come down with his boys and . . . take his baby." On October 12, 2012, Grandmother filed a petition in Smith County Chancery Court to terminate Father's parental rights and adopt Child, and on October 15, Father filed a counter petition to establish paternity and request custody. The case was tried on October 11, 2013.

At trial, Father presented a copy of the DNA test results and both parties agreed that Father was the biological father of Child. Grandmother testified that Father had not visited or provided any support for Child during the four months preceding the filing of the petition. She also stated that Father could not reach her at times because she often did not have a

---

[1]As usual, the facts stated in this opinion are based on the record. Father's attorney criticized the testimony, stating, "if you could make sense out of when things happened and why and where from this testimony, I don't know how anybody could." She also accurately referred to the testimony as "a mishmash of information." We particularly had difficulty establishing a timeline and understanding what proceedings had occurred previously.

2

working phone, but she never went more than two days without getting a new one. One of the times she spoke with Father about Child was while she was shopping. Grandmother testified that she hung up on him because it was not a good time for her to talk and, since then, she and Father "had some animosity" between them. As a result, she felt threatened by Father and was only comfortable allowing supervised visits in public places. The one visit Father had with Child was at Panera Bread in October 2012, while Grandmother, her son, and her son-in-law were present. The visit lasted about an hour.

Grandmother testified that Father cancelled two visits they tried to schedule. One visit was to be at Wal-Mart so Father could buy Child some clothes and give her some money. Grandmother suggested that Father give the money to his lawyer, who could then give it to Grandmother's lawyer. She also stated that, once court proceedings began, she had no problem letting Father visit and stay with her when they were not in court. However, when they were in court, she would tell Father that visiting was not a good idea.

Finally, Grandmother testified that she and her nine grandchildren had a great relationship with Child and that she provided Child with everything she needed. Grandmother's son-in-law, Mother's former best friend, Grandmother's neighbor, and Mother's former colleague from work all testified that Grandmother had a great relationship with Child as well. Grandmother explained that Child got Social Security as a result of Mother's death, had her own insurance, and that Grandmother's family sometimes helped her take care of Child.

Father testified that he was fully disabled as the result of a motorcycle accident from 2006. He was on disability, lived in his mother's guest house,[2] and was behind on child support obligations for his four other children, two of whom had special needs (one could not walk or speak and another was autistic). Father had visitation with his other four children during a month of summer vacation, a month during winter vacations, and every other weekend. When Father had his children with him, he cooked, cleaned, and did everything for them on his own.

Father testified that he did not cancel the visit with Child at Wal-Mart, as Grandmother testified. Instead, Father testified that it was never set up despite multiple attempts by him and his lawyer to arrange it. Despite his failure to pay child support, Father

---

[2] One of Father's children testified that when they visit they all stay in a different house than the one Father testified he lived in – the house Father testified he rented to others. The trial court found this conflicting testimony "alarming," but made no credibility finding as to either Father or the child.

3

did provide Mother with an Electronic Benefit Transfer ("EBT")[3] card prior to her death. The card was intended for Mother to buy things for Child, and, after Mother's death, the card was transferred to Grandmother through Grandmother's counsel. Father stated that he was familiar with California law but did not understand Tennessee law, which is why he never tried to get custody of Child prior to May 2012.

Father further testified that he was "full of emotion" when he found out about Child. He was happy to have a child but sad to lose Mother. Grandmother did not dispute this. Father also testified that, before Mother's death, he purchased diapers, a TV stand, a computer stand, and a life insurance policy for Mother and Child. In addition, he repainted and rebuilt Mother's fireplace mantle and did other "little things around the house." Father said he tried to set up visitation with Child, but before October 2012, he was often unable to reach Grandmother. When he did, she would either tell him that it was not a good idea for him to visit or to wait until the next court date. Father said that every time he tried to set up visitation after October, Grandmother told him it was not a good idea. During Grandmother's testimony, she agreed that it would be unreasonable for someone who is trying to visit his child to fly three thousand miles and stay in a hotel without a definite visit scheduled.

In regard to his income, Father testified that he lived in a home with his mother but also owned another home that he rented out. However, given the real estate downturn, he only broke even. Father testified that he might be able to sell that home for forty or fifty thousand dollars "after everything settled." He also said that he and Child were beneficiaries of the life insurance policy he bought for Mother, but it had not been redeemed because he had not been to Tennessee recently and a doctor needed to sign off on the policy. Father also needed the death certificate, which he was unable to obtain before he was recognized as Child's father.

Two of Father's other children testified that they loved Father, he took care of them, kept them safe, and they had fun with him. At the end of the proceedings, Child was brought into the court and allowed to interact with Father and his siblings. Although it was not at issue, the trial court judge determined that, based on their interaction, Father would be allowed unsupervised visitation; all of the children seemed outgoing and intelligent, and there did not seem to be any need for supervision.

---

[3] "Electronic Benefit Transfer . . . is a system for delivering Food Stamp and Families First benefits to eligible Tennesseans." *EBT Cards*, DEPARTMENT OF HUMAN SERVICES, http://www.tn.gov/humanserv/adfam/fs_4.html (last visited Nov. 17, 2014). Father testified that he was the beneficiary of the EBT card, not Lyric. It can be inferred that it was a California EBT card and that Father received some sort of benefits from the State of California.

4

The trial court eventually held that Father's parental rights should be terminated based on Tenn. Code Ann. § 36-1-113(g)(9)(A)(ii) and (iii), and the court established a parent and child relationship between Grandmother and Child based on Tenn. Code Ann. § 36-1-121 (as amended). The court did not accept Father's reasons for not paying child support and not visiting more often. The court found that Father had the financial means to hire a lawyer sooner and support Child for the four months preceding the filing of the petition, but that he willfully chose not to. The court also found that Father did not seek reasonable visitation with Child or visit her at all for the four months preceding the filing of the petition. The court held that Father abandoned Child, and that terminating Father's parental rights and permitting adoption by Grandmother were in Child's best interest. The final order was issued on March 24, 2014, and this appeal followed.

STANDARD OF REVIEW

"A parent has a fundamental right to the care, custody, and control of his or her child." *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *1 (Tenn. Ct. App. May 21, 2014), perm. app. denied (Tenn. July 14, 2014). The state may only interfere with parental rights if there is a compelling state interest. *Id.* "An order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian." Tenn. Code Ann. § 36-1-113(l)(1).

Terminating a parent's fundamental parental rights results in severe consequences; therefore, termination cases require a higher standard of proof. *In re Serenity B.*, 2014 WL 2168553, at *2. To terminate parental rights, the court must find by clear and convincing evidence that at least one statutory ground for termination exists and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, 2014 WL 2168553, at *2 (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)) (internal citations omitted).

This Court must then review the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates to the contrary. *Id.*; Tenn. R. App. P. 13(d). Upon reviewing a decision to terminate parental rights, this Court's duty is to "determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights." *In re Serenity B.*, 2014 WL 2168553, at *2.

5

ANALYSIS

Father raises the following four issues on appeal: (1) whether there is clear and convincing evidence to support the finding that Father abandoned Child; (2) whether there is clear and convincing evidence to support the finding that it is in Child's best interest to terminate Father's parental rights; (3) whether deficiencies in Grandmother's proof cause her petition to fail on its merits; and (4) whether the chancery court had jurisdiction over the custody petition filed by Father. We will discuss each issue in turn.

The resolution of this matter involves the interpretation of several statutes. The words of statutes "must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." *Mills v. Fulmarque, Inc.*, 360 S.W.3d 362, 368 (Tenn. 2012). We are to presume that every word in the statute has meaning and purpose and should be given full effect unless the obvious intention of the General Assembly indicates otherwise. *In re Estate of Trigg*, 368 S.W.3d 483, 490 (Tenn.2012); *In re C.K.G.*, 173 S.W.3d 714, 722 (Tenn. 2005).

I.

Father's parental rights were terminated based on the trial court's findings that Father willfully failed to visit and support Child.[4] The relevant statutory provisions are Tenn. Code Ann. § 36-1-113 and § 36-1-102, which provide, in part:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> > (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

Tenn. Code Ann. § 36-1-113(g)(1).

_____

[4] The trial court stated that it terminated Father's parental rights based on § 36-1-113(g)(9)(A)(ii) and (iii), but both parties and the court focused their discussions on abandonment, which is a ground for termination of parental rights under Tenn. Code Ann. § 36-1-113(g)(1) and is defined in Tenn. Code Ann. § 36-1-102(1)(A)(i). Section 36-1-113(g)(9) applies to parents who, "at the time of the filing of [the] petition . . . [are] not the legal parent or guardian" of the child. These grounds were not pled, and Father, by agreement, has been established as the legal parent of Child. Therefore, we will only consider the issue of termination based on abandonment under Tenn. Code Ann. § 36-1-113(g)(1) .

6

For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i).

A. WILLFUL FAILURE TO VISIT

Father argues that his failure to visit was not willful given his limited financial means and the fact that he lives in California. He claims that he tried to set up visits but had difficulty contacting Grandmother and obtaining her consent for him to visit.

Willful failure to visit is defined as "the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation[.]" Tenn. Code Ann. § 36-1-102(1)(E). "Token visitation" is visitation that, "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C). For a parent's failure to visit to be considered willful, the parent must have intended not to visit the child. *See In re Adoption of Copeland*, 43 S.W.3d 483, 488 (Tenn. Ct. App. 2000).

A parent who has tried to visit his or her child but has been "thwarted by the acts of others and circumstances beyond his [or her] control" has not willfully failed to visit. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007). A parent's failure to visit may be excused by a third party's conduct if the conduct "actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *In re Audrey S.*, 182 S.W.3d 838, 864 (Tenn. Ct. App. 2005) (citations omitted).

This Court has set forth a list of actions that amount to a significant restraint or interference with a parent's efforts to develop a relationship with a child: "(1) telling a man he is not the child's biological father, (2) blocking access to the child, (3) keeping the child's

7

whereabouts unknown, (4) vigorously resisting the parent's efforts to support the child, or (5) vigorously resisting a parent's efforts to visit the child." *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 n.8 (Tenn. Ct. App. Nov. 25, 2003).

Grandmother asserts that Father's failure to visit Child was willful. In support of her argument, she relies on *In re Z.R.S.*, No. M2008-00630-COA-R3-PT, 2008 WL 5272489 (Tenn. Ct. App. Dec.16, 2008), in which this Court terminated a father's parental rights after he only visited his daughter two times between the time she went into foster care and the first day of trial. *Id.* at *10. Neither of those visits was during the four months preceding the filing of the petition. *Id.* Grandmother also relies on *In re Angela T.*, No. W2011-01588-COA-R3-PT, 2012 WL 586864 (Tenn. Ct. App. Feb. 23, 2012), in which the court terminated a father's parental rights because he made no effort to reinstate visitation or maintain any type of relationship with his children for three years prior to the petition to terminate his rights. *Id.* at *5.

Both of the cases relied on by Grandmother are distinguishable from the case at hand. In *In re Z.R.S.*, the only thing stopping the father from visiting his child during the four months preceding the filing of the petition was his voluntary refusal to take a drug screen. 2008 WL 5272489, at *10. Here, Father has limited financial means, lives over 2000 miles away, and has difficulty communicating with Grandmother to set up visitation. In *In re Angela T.*, the father had not visited his children for nearly three years, 2012 WL 586864, at *5, while Father here has made efforts to see Child by contacting Grandmother, and he has seen Child on at least one occasion.

It is true that Father did not seek custody of Child or try to set up visitation rights before May 2012, but he did try to stay in contact with Child. Both Father and Grandmother testified that Father called a number of times to speak to Child and set up visits. However, Grandmother often did not have a working phone, which made it difficult for Father to reach her, and Grandmother often told Father it was not a good idea for him to visit. Grandmother admitted that it would be unreasonable for Father to travel from California to Tennessee without speaking to Grandmother first and knowing that he would be able to visit Child. Grandmother's hesitancy to arrange visits with Father, coupled with Father's limited finances, the distance he had to travel, and his responsibilities as the father of four other children living in California made it extremely difficult for Father to visit Child.

In addition, both Grandmother and Father testified that Father was genuinely happy to have Child, and Father's other children testified that Father loves them, takes care of them, and that they love him as well. This evidence, in addition to the hurdles that Father had to overcome to visit Child convinces us that the evidence is not strong enough to establish clearly and convincingly that Father willfully failed to visit Child. Therefore, we reverse the

trial court's finding of willful abandonment for failure to visit Child.

## B. WILLFUL FAILURE TO SUPPORT

Father also argues that his failure to support Child was not willful given his limited financial means and the fact that he has to support four other children. He contends that the clear and convincing standard has not been met because no evidence was provided regarding his income, budget, or expenses.

Just like a parent's failure to visit, failure to support a child financially can be grounds for terminating parental rights if the failure was willful. Tenn. Code Ann. § 36-1-102(1)(A)(i); *In re H.A.L.*, No. M2005-00045-COA-R3-PT, 2005 WL 954866, at *4 (Tenn. Ct. App. Apr. 25, 2005); *In re M.J.B.*, 140 S.W.3d at 655 ("Simply proving that a parent did not support [his or] her children is not sufficient . . . ."). Willful failure to support is "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token payments, or "token support," are payments that, "under the circumstances of the individual case, [are] insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

A parent's failure to support is willful when he or she "is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support." *In re Muir*, 2003 WL 22794524, at *5. A parent who does not support his or her child because he or she is financially unable to do so is not liable for willfully failing to support his or her child. *Id.* at n.7.

The case *In re H.A.L.* involved termination of the parental rights of a father ("R.W.L.") who had been incarcerated for most of his daughter's life. *In re H.A.L.*, 2005 WL 954866, at *1. One of the grounds for termination was abandonment by willful failure to support. *Id.* The only evidence presented was that R.W.L. had "held down some sort of employment between September 1998 and September 1999." *Id.* at *6. This Court held that, without any evidence of R.W.L.'s income, expenses, or financial ability to pay child support, the record did not contain clear and convincing evidence that R.W.L. willfully failed to support his daughter for the four months at issue. *Id.*

The case *In re M.J.B.* involved termination of the parental rights of a mother ("K.D.M.") with regard to her two children. *In re M.J.B.*, 140 S.W.3d at 645. She had no marketable skills, and the court found that she had worked at only low paying jobs for brief periods of time. *Id.* at 655. There was no evidence presented showing her actual earnings from these jobs, and she relied on others for financial support. *Id.* As a result, this Court

9

held that the record did not contain clear and convincing evidence to establish that K.D.M. was capable of supporting her children or that she willfully chose not to. *Id.*

Here, as in *In re H.A.L.* and *In re M.J.B.*, no evidence has been introduced to establish Father's actual income, expenses, or financial ability to support Child. The evidence suggested Father could have benefitted from Mother's life insurance policy, currently receives disability payments, and owns a home that he testified he *may* be able to sell for around forty or fifty thousand dollars. There was no evidence presented to indicate that he could have sold this house at some point during the four months preceding the filing of the petition to terminate his parental rights. There was no evidence to indicate how much he earns from his disability payments or the amount he would have received from the life insurance policy. Father testified that he does not actually make any money from renting out his other property.

Father is completely disabled and unable to work, he lives in his mother's guest house, and he is behind on child support payments for his four other children. Without any evidence of Father's actual ability to support Child, we do not believe that there is enough evidence to establish clearly and convincingly that Father willfully failed to support Child. Therefore, we reverse the trial court's finding of willful abandonment for failure to support Child.

## II.

If a court finds that there are no grounds for termination, it is unnecessary to conduct a best interest analysis. *See, e.g.*, *In re Valentine*, 79 S.W.3d 539, 550 (Tenn. 2002) (stating that "we do not reach the issue of whether termination . . . was in [the child's] best interest" if no grounds for termination have been proven). We find that the only ground for termination in this case (abandonment) has not been proven, and, therefore, we do not address the issue of Child's best interest.

## III.

We decline to address Father's other arguments in regard to Grandmother's petition because her petition has failed to establish the only asserted ground for termination.

## IV.

Father also claims that either this Court or the chancery court should grant him custody of Child. He argues that this Court has jurisdiction over custody decisions pursuant to Tenn. Code Ann. § 36-1-116(f)(1). This statute concerns petitions seeking adoptions and provides that:

Upon the filing of the petition, the court shall have exclusive jurisdiction of all matters pertaining to the child, including the establishment of paternity of a child pursuant to chapter 2, part 3 of this title, except for allegations of delinquency, unruliness or truancy of the child pursuant to title 37; provided, that, unless a party has filed an intervening petition to an existing adoption petition concerning a child who is in the physical custody of the original petitioners, the court shall have no jurisdiction to issue any orders granting custody or guardianship of the child to the petitioners or to the intervening petitioners or granting an adoption of the child to the petitioners or to the intervening petitioners unless the petition affirmatively states, and the court finds in its order, that the petitioners have physical custody of the child at the time of the filing of the petition, entry of the order of guardianship, or entry of the order of adoption, or unless the petitioners otherwise meet the requirements of § 36-1-111(d)(6).

Section 36-1-116(f)(1) refers to the trial court, not the appellate court. *See In re Shyann B.*, No. E2011-01740-COA-R3-JV, 2012 WL 2499591, at *6 (Tenn. Ct. App. June 29, 2012) ("To begin, there is no dispute that the trial court acquired 'exclusive jurisdiction of all matters pertaining to the child' upon the filing of Foster Mother's adoption petition.") (quoting Tenn. Code Ann. § 36-1-116(f)(1)); *In re Adoption of M.J.S.*, 44 S.W.3d 41, 51-52 (Tenn. Ct. App. 2000) ("When an adoption petition is filed, the trial court in which the petition is filed has 'exclusive jurisdiction of all matters pertaining to the child . . . .'") (quoting Tenn. Code Ann. § 36-1-116(f)(1)). In this case, the court with exclusive jurisdiction is the Smith County Chancery Court.

Tenn. Code Ann. Section 36-1-116(f)(1) gives the court in which the adoption petition is filed "exclusive jurisdiction of all matters pertaining to the child . . . ." At first blush, the remaining language of Section 36-1-116(f)(1) appears to apply to limit the court's authority to issue custody orders. However, that portion of the statute has no application because no intervening petitions were filed—Father was a party to the suit. Father filed a counter petition to establish paternity and for custody.[5]

---

[5]This point may be merely an academic one in light of the fact that petitioner's petition shows that they have custody of the child. Tennessee Code Annotated section 36-1-116(f)(1) states: "the court shall have no jurisdiction to issue any orders granting custody or guardianship of the child . . . . unless the petition affirmatively states, and the court finds in its order, that the petitioners have physical custody of the child at the time of the filing of the petition . . . ." Thus, a custody order would be allowed even if the latter part of the subsection applied.

Two other statutes are also pertinent to this discussion. Tennessee Code Annotated section 36-1-116(f)(2) states:

Except for proceedings concerning allegations of delinquency, unruliness, or truancy of the child under title 37, any proceedings that may be pending seeking the custody or guardianship of the child or visitation with the child who is in the physical custody of the petitioners on the date the petition is filed, or where the petitioners meet the requirement of § 36-1-111(d)(6), shall be suspended pending the court's orders in the adoption proceeding, and jurisdiction of all other pending matters concerning the child and proceedings concerning establishment of the paternity of the child shall be transferred to and assumed by the adoption court; provided, that until the adoption court enters any orders affecting the child's custody or guardianship as permitted by this part, all prior parental or guardian authority, prior court orders regarding custody or guardianship, or statutory authority concerning the child's status shall remain in effect.

Thus, the custody proceedings pending in Davidson County Juvenile Court were "suspended pending the court's orders in the adoption proceeding." The Smith County Chancery Court had authority to and did establish paternity by the agreement of the parties based on the blood test. The Juvenile Court's orders affecting custody remained in effect "until the adoption court enters any orders affecting the child's custody or guardianship as permitted by this part . . . ."

The second relevant statute is Tenn. Code Ann. § 36-1-117(b)(4),[6] which provides that:

If grounds for termination of parental rights do not exist, then the child's legal father shall be granted custody of the child, unless the court determines, upon clear and convincing evidence, that the legal father is unable currently to provide proper custodial care for the child, in which case the court shall make such orders as may be necessary for the child's care and supervision pursuant to § 37-1-140; or unless the child's mother's rights have not been previously terminated, in which case the court shall make a determination of the custodial status of the child between the legal father and the mother, and the court may make such other orders as are necessary to provide for the child's care and supervision. If the court determines that neither parent is suitable to provide

_____

[6] Father cites Tenn. Code Ann. § 37-1-117(b)(4), but there is no such provision and we believe that this was a typographical error.

12

for the care of the child, it shall make such other orders as it may determine are necessary for the child's care and supervision.

In a pretrial discussion, the parties and the court expressed some confusion about what would happen if no grounds for termination were found. Some thought was given to having to return to the Davidson County Juvenile Court to change its previous custody order.

As already noted, the Juvenile Court's orders affecting custody remained in effect "until the adoption court enters any orders affecting the child's custody or guardianship as permitted by this part . . . ." Tenn. Code Ann. § 36-1-116(f)(2). This is where Tenn. Code Ann. § 36-1-117(b)(4) comes into play. The statute requires the trial court to grant custody to the legal parent in an adoption proceeding if no grounds for termination exist, unless the court determines by clear and convincing evidence that the father is unable to provide the child with proper custodial care. Tenn. Code Ann. § 36-1-117(b)(4); Diana L. Schmied, *A Roadmap Through Tennessee's New Adoption Statute*, 27 U. MEM. L. REV. 885, 896-97 (1997) (citing § 36-1-117(b)(4) and stating that "[i]f no grounds to terminate exist [in an adoption proceeding], the father must be granted custody of the child if the mother's rights have already been terminated, unless he is unable to provide proper care for the child."). The clear language of Tenn. Code Ann. § 36-1-117(b)(4) provides the Smith County Chancery Court with the authority to make a custody determination when the grounds for termination of Father's rights are not found.

After considering the relevant statutes and the record in this case, it is evident that the focus of the hearing was abandonment by failure to visit and failure to support, not custody. Therefore, we remand the case to the chancery court for the purpose of making a custody determination pursuant to Tenn. Code Ann. § 36-1-117(4).

CONCLUSION

The judgment of the chancery court is reversed and remanded for further proceedings consistent with this opinion. Costs of appeal are assessed against the appellees.

_____
ANDY D. BENNETT, JUDGE